NGUYEN DA YEN et al., Plaintiffs-
Appellants, Cross-Appellees,

v.

Henry KISSINGER, Secretary of State,
et al., Defendants-Appellees,
Cross-Appellants.

Nos. 75–2493, 75–2632.

United States Court of Appeals,
Ninth Circuit.

Nov. 5, 1975.

Morton P. Cohen (argued), Golden Gate School of Law, San Francisco, Cal., Nancy Stearns (argued), Center for Constitutional Rights, New York City, for appellants.

Lawrence W. Chamblee (argued), Atty., Government Regulations Section, Crim. Div., U. S. Dept. of Justice, Washington, D. C., for appellees.

## OPINION

Before CHAMBERS, KOELSCH and TRASK, Circuit Judges.

KOELSCH, Circuit Judge:

These are cross-appeals from a preliminary injunctive order over which we have jurisdiction under 28 U.S.C. § 1292(a)(1). We heard the appeals on an expedited basis on August 14, 1975, and on that day affirmed the order, as we revised it. Because of temporal exigencies, we were unable to immediately explicate our rationale in a written opinion and were compelled to defer that matter to a later time. Having now had a decent opportunity to thoroughly study and consider the numerous and difficult issues, we conclude that our earlier order must be modified, and for the following reasons.

We think it fair to conclude that this is a unique lawsuit, responsive to a high-

ly unusual operation—the Vietnamese Orphan "Babylift." During the waning hours of our involvement in Vietnam, as the fall of Saigon grew imminent, various agencies of the United States Government, in concert with private American adoption agencies, participated in an airlift to evacuate children from Vietnam. The airlift was apparently intended to remove only those children who were already in some stage of the requisite procedure for admission to the United States and adoption by American families—*i. e.*, who were adoptable under Vietnamese law, legally in the custody of the American private agencies, and who satisfied the criteria for admission into the United States under the definition of an orphan "child," 8 U.S.C. § 1101(b)(1) (F), classifiable as an "immediate relative" under 8 U.S.C. § 1151(b).

However, it now appears that some of the 2700 children airlifted were brought here improperly. We are presently dealing with a very limited record. The documentation accompanying some of the children is insufficient on its face to establish the child's status as an orphan, abandoned, or irrevocably released child, the validity of the private agency's custody of such a child under Vietnamese child custody law, or the child's eligibility for admission under 8 U.S.C. §§ 1101(b)(1)(F) and 1151(b). While inadequate documentation is in many cases the product of the last minute haste of the evacuation, in at least some cases, as the district court found, it is because the children are not orphans and have not been validly released into the custody of the adoption agencies. From plaintiffs' assertions, it appears that some of the children have a living parent, and were merely left in orphanages for safekeeping (Vietnamese orphanages allegedly serve some of the functions of day care centers). The parent(s) may or may not know the child is alive, or where it is. Other children were allegedly released with the understanding that the parents would be reunited with the child here; still others were released by hysterical

parents terrorized by the fear that the child would be murdered by the approaching forces. In the latter situations plaintiffs question the validity of the releases.

To put the matter in broad outline, the ultimate objective the plaintiffs seek is the reunion of children with their parents. In order to attain that objective, plaintiffs seek the accumulation and investigation of the children's records in order to identify and locate children who may have living parents (the children are now spread all over the country in foster and adoptive homes), and the establishment of procedures for locating the natural parents and repatriating and reuniting the children with them. Plaintiffs seek to accomplish those objectives expeditiously, in one lawsuit in a single forum, before the passage of time erases the children's memories (making more difficult the location of living relatives), and makes even more bitter the disruption in the child's and adoptive parents' lives should the child eventually be reunited with its natural parents.

A variety of legal theories are advanced in the complaint to sustain plaintiffs' claim to relief. In essence, plaintiffs allege that the defendants' cooperation in the removal of a child from Vietnam without proper custody of it having been obtained (including by totally voluntary parental releases), and its continued, allegedly involuntary, detention in this country in custody other than that of its natural parent, is a violation of the child's fundamental human rights and of its Fifth Amendment right to liberty and due process. The legal vehicle by which that claim is asserted on behalf of those of the 2700 orphans who share the complaint is a class action. The three named plaintiffs are children who apparently have living parents in Vietnam. They are represented by a guardian *ad litem* appointed by the court, and by the latter's attorneys. The class they seek to represent is of course as yet indeterminate—the district court has allowed the suit to proceed as a class action for

discovery purposes in order to determine the identity of children who may share the named plaintiffs' legal claim.[1]

The proceeding is still very much in the preliminary stages. Having filed their complaint, plaintiffs immediately moved for a preliminary injunction, seeking *inter alia* that the defendants accumulate records necessary to determine each child's adoptive status and to find its parents, disclosure of those records to plaintiffs, institution of procedures through international agencies for tracing parents or relatives, a stay of all adoption proceedings until, where necessary, a search for parents or relatives fails, and the immediate return of any child found to have a living parent seeking its return. At a series of hearings it became apparent that one of the defendants, the Immigration and Naturalization Service, intended and perhaps had already begun, to conduct an investigation aimed at developing some of the information sought by plaintiffs. Because of the press of time, the INS had departed from its usual procedure requiring the filing and approval of form I–600, Petition to Classify Orphan as an Immediate Relative, with the accompanying documentation required to establish eligibility under 8 U.S.C. §§ 1151(b) and 1101(b)(1)(F),[2] before the Babylift orphans were admitted to the United States. *See* 8 C.F.R. § 204.2(d). Rather,

the INS had facilitated the children's removal from Vietnam through the exercise of the discretionary parole power. 8 U.S.C. § 1182(d)(5), which enables the Attorney General or his delegate to parole an alien into the United States if in the public interest, without regard to the alien's immigrant status or other entitlement to admission. As a result, the children are in this country with an undetermined immigration status.[3]

■ As the INS investigation was to develop the preliminary information sought by plaintiffs, the district judge initially sought to obtain the parties' consent to an order regulating the time schedule and procedures for the investigation. That proved impossible to obtain. The INS took the position that the exercise of the parole power and the conduct of the investigation were matters outside the court's jurisdiction because committed to unreviewable agency discretion under the Administrative Procedure Act, *see* 5 U.S.C. § 701(a)(2), and the plaintiffs were inalterably convinced that the proposed INS investigation was not sufficiently expeditious and thorough. In the end, the district judge entered an order *inter alia* setting a timetable for the investigation and requiring progress reports, the development and implementation of plans for the conduct of overseas investigations and repatriations, immediate repatriation of children

---

1. In essence, the suit is a mass child custody proceeding wherein the guardian *ad litem* and her attorneys are representing the interests of the natural parents, and of the children insofar as their interest conform to the legal presumption that they are best off in the custody and care of their natural parents.

2. Under 8 U.S.C. § 1151(b) a "child" classified as an immediate relative can immigrate regardless of national quotas. Under 8 U.S.C. § 1101(b)(1)(F) orphans and other defined categories of children may be classified as a "child" under § 1151(b).

3. Once an alien is paroled into this country, he may remain here until the Attorney General determines the purpose of his parole has been served, conceivably for his entire lifetime. As a result the INS was not required to conduct an investigation to determine the children's

status until a form I–600 was filed, and such a form need not be filed until termination of parole status required that the alien child obtain immigrant status. However, because of the questions raised about the children, and because of the possibility and heartbreaking consequences of a belated determination that a child is inadmissible other than in parole status, the INS commendably determined that an immediate investigation would be best for all concerned. As a result, the INS set various conditions of parole respecting the children designed to freeze their status and insure their welfare during the pendency of the investigation, and sent letters to the Attorney General of every state and the foster family of each child explaining those conditions, and urging that adoption proceedings not be initiated until the child's immigration status is determined.

the INS determines "should be returned to their parents in Vietnam," and providing for limited, random discovery by the plaintiffs of investigation files. Both sides are dissatisfied; each has appealed.[4]

■■■ We turn first to the defendants' major objection to the order—that the exercise of the parole power and the conduct of the administrative investigation are committed to unreviewable agency discretion—and reject it. Defendants altogether misconceive the thrust of plaintiffs' complaint. According to their allegations, plaintiffs have neither sought nor desire the discretionary exercise of the parole power for their benefit. Rather, they complain that the parole power has been employed to facilitate a continuing deprivation of their constitutional rights. While the courts might well be prevented by § 701(a)(2) of the A.P.A. from inquiring into the Attorney General's decision whether or not to admit in parole status an alien seeking admission, nothing in the A.P.A. purports to sanction the violation of constitutional rights committed under the guise of the exercise of discretion, or prevents a court from inquiring into and remedying the deprivation. The purpose of the "committed to agency discretion" exception is entirely served by insulation of administrative discretion, operating in its assigned sphere, from judicial usurpation. Simply put, defendants' discretion does not extend to the violation of constitutional rights, nor can it—the sovereignty they exercise, whether delegated by Congress to be exercised with strict limitations or in a broadly discretionary manner, is al-

ways and necessarily bounded by the limitations placed on that power in the Constitution. A court of competent jurisdiction may entertain a suit to remedy a deprivation committed by an unconstitutional exercise of discretion in the same manner as a suit to remedy any other act violative of constitutional rights, without in any way substituting its discretion and judgment in a matter assigned to the administrator.[5]

■■■ Defendants also misconceive the relationship between their administrative investigation and plaintiffs' suit. We have no quarrel with the proposition that the A.P.A. generally precludes judicial review of the manner in which the Attorney General chooses to inquire into the immigration status of an alien seeking admission. However, that is not this case. In the context of plaintiffs' suit, the order regulating the conduct of the investigation is a means of developing the information necessary for resolution of their claim—essentially a discovery procedure. While both the investigation and the lawsuit are aimed at determining the children's status, the investigation is not, as defendants seem to assume, conclusive of the issues raised by the suit. True, a determination that a particular child's records establish its admissibility to the INS's satisfaction also implicitly suggests that the child is an orphan, abandoned or irrevocably released, *see* 8 U.S.C. § 1101(b)(1)(F), hence that it was properly brought to this country, that its present custody is legal and that it is not a member of the plaintiff class. However, the INS is a defendant in this action, and the court cannot be bound by its view of the law

4. As previously noted, our jurisdiction is predicated on 28 U.S.C. § 1292(a)(1), which gives us jurisdiction to review orders granting or denying injunctions. As indicated below, we view the district court's order as largely a discovery order—ordinarily non-appealable. However, appealability turns not on labels but on the substantial impact of the order. Some aspects of the order—*i. e.*, the repatriation provision—are clearly injunctive, both in substance and form. And the remainder, placing the INS investigation under the mandate of the court,

considering the integral part a determination of the children's immigrant status plays in the relief plaintiffs request, are mandatorily injunctive in substance. Hence, we are clear we have jurisdiction to review the order in full.

5. Defendants might in other circumstances have a good faith immunity from a damage suit in this context, but plaintiffs seek only injunctive relief here. *See Mark v. Groff*, 521 F.2d 1376 (9th Cir. 1975).

**1200**

and facts in determining whether the children's rights have been violated—the plaintiffs allege that the defendants' view of Vietnamese law and social mores, and their application of domestic law, is erroneous, and has resulted in the enforced separation of children from their parents against their will.[6] It is ultimately for the court to determine the validity of the child's present custody and resolve its legal claim. To do so, the court can compel the accumulation and production of necessary information as it would in any other suit, and do so by compelling the fruits of an existing investigation, regardless of the fact that the administrator would otherwise have discretion whether or not to conduct the investigation. In short, plaintiffs do not seek review of the conduct of an administrative investigation.[7] They seek facts available to the defendants germane to their claim (incidentally the same facts the INS needs to determine immigration status), which the court may compel and which the INS has no discretion to refuse to produce.

We turn next to an issue which the parties have not discussed, but which even at a casual glance it is apparent we must confront—the jurisdiction of the district court.[8] While we have concluded that the A.P.A. does not bar litigation of the claim, it is fundamental that the district court must independently have both jurisdiction and a source of power to enter the order it did. Of the various jurisdictional grounds asserted in plaintiffs' complaint, the grounds expressly relied on by the district court are either inapposite or highly questionable.

28 U.S.C. § 1343(3), the jurisdictional basis for 42 U.S.C. § 1983 civil rights actions, requires action under color of state law. With a minor exception, the named defendants are all Federal officials, and as presently constituted, the complaint alleges no actions by these defendants under color of state law. *See District of Columbia v. Carter,* 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973).[9]

The ordinary jurisdictional basis for civil rights actions against Federal officials, also relied on by the district court, is 28 U.S.C. § 1331. *See, e. g., Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946). However, § 1331 requires that the "matter in controversy exceeds the sum or value of $10,000 . . . ." *See, e. g., Lynch v. Household Finance Corp.,* 405 U.S. 538, 547–550, 92 S.Ct. 1113, 31 L.Ed.2d 424

---

6. We do not wish to suggest in any way that defendants are not proceeding in good faith. Hopefully in a great majority of cases the INS investigation will establish a child's status to everyone's satisfaction. However, we cannot ignore the natural inclination to justify after the fact the exercise of the parole power and protect the interests of the American agencies and adoptive parents by finding children in dubious circumstances adoptable, rather than investigating further. Moreover, it appears that already some dispute is arising as to the significance of Vietnamese releases, particularly the significance of an orphanage's release under Article 250 of the Civil Code of the Republic of Vietnam. While defendants take the view that such a release is sufficient, it is also perfectly plausible to construe the statute to require the benevolent society to have proper legal custody of the child before it may consent to its adoption. It will ultimately be for the court to determine the impact of Vietnamese releases on the legality of the child's present custody, and determine if further investigation is required.

7. Indeed, the suit was filed, seeking accumulation and production of the records, before it was apparent that the INS would embark on its investigation.

8. Without extensively belaboring the point, we would like to point out to plaintiffs that while they have been bombarding us with urgings to haste, we have been substantially delayed filling in various fundamental legal nooks and crannies they have overlooked in their haste. We understand plaintiffs' concern for speed, and share it. Nevertheless, plaintiffs have invoked the legal process in their aid, and must step by step conform to that process. We would suggest that some deliberate, careful attention to legal detail will speed the end of this suit, not delay it.

9. The complaint, if amended to join state officials or adoption agencies and to allege a conspiracy aided by Federal officials under color of state laws, might arguably invoke § 1983 jurisdiction as to these defendants.

(1972). Plaintiffs' complaint fails to allege that the matter in controversy is worth that sum. While the complaint may be amended to provide the requisite jurisdictional allegation, the jurisdiction of the district court is not properly invoked at this time.[10]

■ The provisions of the Immigration and Nationality Act cited by the district court, 8 U.S.C. § 1101 et seq., are not jurisdictional. Review of administrative application of those provisions is ordinarily regulated by the A.P.A., 5 U.S.C. § 701 et seq., which plaintiffs suggest as a jurisdictional basis in their complaint. While the issue has not been

resolved by the Court,[11] and while there is conflicting authority in this circuit, our most recent view is that the A.P.A., like the Declaratory Judgment Act, 28 U.S.C. § 2201, does not independently confer jurisdiction on the district court. Compare Wiren v. Eide, No. 74–1169 (9th Cir., September 3, 1975), with Brandt v. Hickel, 427 F.2d 53, 55 and 55 n.2 (9th Cir. 1970); Coleman v. United States, 363 F.2d 190 (9th Cir. 1966), rev'd on other grounds, 390 U.S. 599, 88 S.Ct. 1327, 20 L.Ed.2d 170 (1968); Adams v. Witmer, 271 F.2d 29 (9th Cir. 1959).[12] Other jurisdictional grounds suggested by plaintiffs but not expressly relied on by the district court are likewise problematical,[13]

**10.** It may be that in some circumstances in which the facts alleged in a complaint reveal the requisite amount in controversy the jurisdiction of the court is apparent despite a lack of a formal allegation required by F.R.Civ.P. 8(a)(1). Here we are reluctant to hang our hat on that hook, because even amendment may not establish § 1331 jurisdiction. Plaintiffs seek injunctive relief, not money damages. While all that is required is that the matter in controversy be $10,000 in value (not that $10,000 be sought), it is very much an unresolved question in this circuit whether an intangible right of the sort at issue here can be valued to confer § 1331 jurisdiction. See Hague v. C. I. O., 307 U.S. 496, 508, 59 S.Ct. 954, 83 L.Ed. 1423 (opinion of Roberts, J.), 527 et seq. (opinion of Stone, J.) (1939). See Apton v. Wilson, 506 F.2d 83, 95 (D.C.Cir.1974); Hartigh v. Latin, 158 U.S.App.D.C. 289, 485 F.2d 1068 (1973); Sullivan v. Murphy, 478 F.2d 938, 960 and 960–961 n. 34 (D.C.Cir.1973); Gomez v. Wilson, 155 U.S.App.D.C. 242, 477 F.2d 411, 419–421 (1973); Spock v. David, 469 F.2d 1047, 1052–1053 (3d Cir. 1972). We think resolution of that issue here must await the plaintiffs' decision whether or not to amend their complaint properly to allege § 1331 jurisdictional facts.

**11.** Other circuits are split on the issue. Compare Ortego v. Weinberger, 516 F.2d 1005 (5th Cir., 1975), and Pickus v. United States Board of Parole, 507 F.2d 1107 (D.C.Cir.1974), with Getty Oil Co. (Eastern Operation) v. Ruckelshaus, 467 F.2d 349 (3d Cir. 1972).

**12.** We are reluctant to address the conflict here, without briefing of the issue, and it is at this point unnecessary, given the other jurisdictional ground on which we rely. Moreover, while this suit might be construed as seeking review of the exercise of the parole power, we think it is in reality not an administrative review proceeding in the normal sense. We hes-

itate to impose the administrative review model, with its attendant doctrines of finality, ripeness, exhaustion and the like, on the claim asserted here.

**13.** 28 U.S.C. § 1350, which gives the district court jurisdiction of "any civil action by an alien for a tort only, committed in violation of the law of nations . . . ." may be available. The illegal seizure, removal and detention of an alien against his will in a foreign country would appear to be a tort, see Abdul-Rahman Omar Adra v. Clift, 195 F.Supp. 857, 862 (D.C. Md.1961), and authorities there cited, and it may well be a tort in violation of the "law of nations." The "law of nations" " 'may be ascertained by consulting the works of jurists, writing professedly on public laws; or by the general usage and practice of nations; or by judicial decisions recognizing and enforcing that law.' " Lopes v. Reederei Richard Schroder, 225 F.Supp. 292, 295 (E.D.Pa.1963), quoting United States v. Smith, 18 U.S. (5 Wheat.) 153, 5 L.Ed. 57 (1820). See Restatement (Second) of Foreign Relations Law § 165, 501–506 (1965); 8 Whiteman, Digest of International Law 697 et seq. (1963). In this regard, see Articles 24, 49, 50, Geneva Convention Relative to the Protection of Civilian Persons in Time of War, August 12, 1949, T.I.A.S. 3365; Sections 12, 13, 15 and 16 of Universal Declaration of Human Rights, approved by the General Assembly of the United Nations on December 10, 1948 [for text, see pt. A of Res. 217(III), U.N. Gen. Ass. Off. Rec. 3d Sess., 1st pt., Resolutions, pp. 71–77]; 5 Whiteman, supra, 230 et seq.; 8 Whiteman, supra, 634–660 (position of State Department that detention and prevention of voluntary repatriation by Russian authorities a violation of international law). But see id., at 638–640. We are reluctant to decide the applicability of § 1350 to this case without adequate briefing. Moreover, we are reluctant to rest on it in any

and, given the possibility of amendment, we are reluctant to rely on them at this early juncture.

However, we have concluded that the district court did have jurisdiction to enter its order under its habeas corpus power, 28 U.S.C. § 2241. This suit is essentially a challenge to the legality of the children's present custody. The traditional function of the Great Writ has been to "afford a swift and imperative remedy in all cases of illegal restraint or confinement;"[14] we see no reason here why the complaint may not be treated as a joint or class application for a writ of habeas corpus (on behalf of those ultimately determined to be illegally detained), and the legality of the children's custody tested in habeas proceedings.

The "in custody" jurisdictional prerequisite to § 2241 habeas jurisdiction is met. As the Court has recognized, custodial restraints on a minor child, even if voluntarily submitted to by the child, have long been held a sufficient deprivation of the child's liberty to be tested by way of habeas corpus. *Jones v. Cunningham*, 371 U.S. 236, 238–240, 240 n.12, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963). *See*,*Developments in the Law— Federal Habeas Corpus*, 83 Harv.L.Rev. 1038, 1073 n.6 (1970); *Ex Parte Swall*, 36 Nev. 171, 134 P. 96, 97 (1913); *In re Burrus*, 136 U.S. 586, 10 S.Ct. 850, 34 L.Ed. 500 (1890); *In the Matter of Barry* (reported as a note to *In re Burrus*), 136 U.S. 597, 602–603, 34 L.Ed. 503 (1844).

The child is presumptively detained if the custody is illegal, *see Ex Parte Swall*, *supra*; *In re Barry*, *supra*, at 603, 34 L.Ed. 503—we see no reason why the child itself may not question the detention. Indeed, habeas has been used in state courts to determine the custody of minor children in circumstances similar to those presented here. *Compare People ex rel. Choolokian v. Mission of Immaculate Virgin, et al., and Same v. New York Foundling Hospital,· et al.*, 192 Misc. 454, 76 N.Y.S.2d 509 (Sup.Ct.1947), *with In the Matter of George Kozmin, Paul Kozmin, Richard Kozmin, and Peter Kozmin*, Nos. 220638, 220639, 220640, 237888, State of Illinois, County of Cook, in the Family Court of Cook County, Decretal Order, August 19, 1959. (Both opinions quoted at 8 Whiteman, *supra* n.13, at 639–640.)

Detention need not be by governmental authorities to confer § 2241 jurisdiction. The Great Writ, *habeas corpus ad subjiciendum*, was even in Blackstone's time a remedy "in all manner of illegal confinement," including false imprisonments by private persons. 3 W. Blackstone, Commentaries 127–132. The Federal habeas statute predicates the exercise of Federal habeas jurisdiction not on the character of the custodian, but on that of the custody: "in violation of the Constitution or laws . . . of the United States." While most private detentions (and child custody conflicts) do not rise to the level of constitutional violations,[15] the govern-

---

event. The complaint presently does not join the adoption agencies as defendants. While the present defendants' involvement in the airlift would certainly constitute them joint tortfeasors, F.R.Civ.P. 19 might dictate joinder of the agencies in order to litigate the suit under § 1350 or § 1331. We are unaware whether such joinder is feasible.

The applicability of mandamus jurisdiction, 28 U.S.C. § 1361, another possibility, is uncertain as well. *Compare Wiren v. Eide*, *supra*, *with Elliott v. Weinberger*, No. 74–1611 (9th Cir., October 1, 1975); *Knuckles v. Weinberger*, 511 F.2d 1221 (9th Cir. 1975), *and Workman v. Mitchell*, 502 F.2d 1201 (9th Cir. 1974).

14. *Secretary of State for Home Affairs v. O'Brien* [1923] A.C. 603, 609 (Earl of Birkenhead).

15. The doctrine of *In re Burrus*, *supra*, or *Matters v. Ryan*, 249 U.S. 375, 39 S.Ct. 315, 63 L.Ed. 654 (1919), does not preclude federal habeas jurisdiction here. When *Burrus* was decided, federal courts had no independent habeas jurisdiction. Their power to issue writs was an ancillary aid to their federal jurisdiction (essentially under the precursor of the All Writs Act), and the Court in *Burrus* simply determined that a child custody dispute was not regulated by federal law and not within the federal court's limited jurisdiction. *In re Burrus*, 136 U.S. at 595–597, 10 S.Ct. 850; *In re Barry*; *Matters v. Ryan*, *supra*, 249 U.S. at 377, 39 S.Ct. 315 *et seq.* In *Burrus* the Court expressly reserved the question of its habeas power in child custody cases given federal diversity jurisdiction. 136 U.S. at 597, 34 L.Ed. 503. The statute has since been amended to

mental involvement in facilitating and maintaining the allegedly illegal physical and legal custody exercised respectively by the foster parents and adoption agencies does present that possibility here, and habeas jurisdiction is proper.[16]

We turn to procedural matters. Treating this suit as a habeas application introduces a class action aspect to habeas which is unusual, but not unprecedented. *See, e. g., Note, Multiparty Habeas Corpus*, 81 Harv.L.Rev. 1482, 1494 (1968); *Wildenhus's Case*, 120 U.S. 1, 7 S.Ct. 385, 30 L.Ed. 565 (1887); *Adderly v. Wainwright*, 272 F.Supp. 530 (M.D.Fla.1967). *See Harris v. Nelson*, 394 U.S. 286, 294–295 n.5, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969). We think under the unique circumstances of this case that the district court had ample power to proceed in habeas as it has.

■ The district court is presented with a quite plausible claim of illegal detention on behalf of some of a group of children, unable to aid themselves, whose identities are unascertained and whose whereabouts are unknown.

"The scope and flexibility of the writ—its capacity to reach all manner of illegal detention—its ability to cut through barriers of form and procedural mazes—have always been emphasized and jealously guarded by courts and lawmakers. The very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected.

"As Blackstone phrased it, habeas corpus is 'the great and efficacious writ, in all manner of illegal confinement.' As this Court said in *Fay v. Noia*, 372 U.S. 391, 401–402, 83 S.Ct. 822, 829, 9 L.Ed.2d 837 (1963), the office of the writ is 'to provide a prompt and efficacious remedy for whatever society deems to be intolerable restraints.' See *Peyton v. Rowe*, 391 U.S. 54, 65–67, 88 S.Ct. 1549, 1555, 20 L.Ed.2d 426 (1968).

"It is now established beyond the reach of reasonable dispute that the federal courts not only may grant evidentiary hearings to applicants, but must do so upon an appropriate showing. *Townsend v. Sain*, 372 U.S. 293, 313, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); *Brown v. Allen*, 344 U.S. 443, 464 n.19, 73 S.Ct. 397, 97 L.Ed. 469 (1953). And this Court has emphasized, taking into account the office of the writ and the fact that the petitioner, being in custody, is usually handicapped in developing the evidence needed to support in

give the federal courts independent habeas jurisdiction, and as we have indicated, we think such jurisdiction is present on the facts alleged here. While the principles of *Burrus* generally dictate federal abstention in domestic relation cases, *see Magaziner v. Montemuro*, 468 F.2d 782, 787 (1st Cir. 1972); *Buechold v. Ortiz*, 401 F.2d 371, 373 (9th Cir. 1968), they are not now a bar jurisdictionally to federal habeas. *See* Hart and Wechsler, The Federal Courts and The Federal System 1016–1017; Wright, Federal Courts § 25, at 84–85 (1970). Under the unique circumstances of this case, abstention is clearly not advisable or required.

**16.** Indeed, wholly aside from the government's role in maintaining private custody—the children are here in parole status and hence at the INS's sufferance—we think that the children can be construed to be in the government's custody for habeas jurisdictional purposes. While in parole status the government can, and has, prescribed parole conditions fixing their residences. The INS, by determining admissibility and status, controls whether or not they will be returned to a living parent, as a decision that the child is admissible will have the practical effect, absent court intervention, of precluding its return to Vietnam. In light of the control exercised over the child, we think that they are in INS custody in the same sense that aliens in alien exclusion cases are deemed "in custody." *See Brownell v. Tom We Shung*, 352 U.S. 180, 183, 77 S.Ct. 252, 1 L.Ed.2d 225 (1956); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 70 S.Ct. 309, 94 L.Ed. 317 (1950); *United States v. Jung Ah Lung*, 124 U.S. 621, 626, 8 S.Ct. 663, 31 L.Ed. 591 (1888). There the alien is considered in custody, despite the fact he is free to go anywhere in the world but into the United States, because governmental action restricts him from entry. Here the governmental action restricts the child's freedom to depart, and the government has the power to remedy the detention.

necessary detail the facts alleged in his petition, that a habeas corpus proceeding must not be allowed to founder in a 'procedural morass.' *Price v. Johnston,* 334 U.S. 266, 269, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948). ·

"There is no higher duty of a court, under our constitutional system, than the careful processing and adjudication of petitions for writs of habeas corpus, for it is in such proceedings that a person in custody charges that error, neglect, or evil purpose has resulted in his unlawful confinement and that he is deprived of his freedom contrary to law. This Court has insistently said that the power of the federal courts to conduct inquiry in habeas corpus is equal to the responsibility which the writ involves: 'The language of Congress, the history of the writ, the decisions of this Court, all make clear that the power of inquiry on federal habeas corpus is plenary.' *Townsend v. Sain,* supra, 372 U.S. at 312, 83 S.Ct. 745." *Harris v. Nelson, supra,* 394 U.S. at 291–292, 89 S.Ct. at 1086 (footnotes omitted).

*See Hensley v. Municipal Court,* 411 U.S. 345, 349–350, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973). Applying those principles, we are clear that the district court had ample power under the All Writs Act, 28 U.S.C. § 1651, to require the INS, which has access to the facts, to develop the preliminary information as to the identity, location, and circumstances of the potential habeas applicants necessary to litigate the claims of illegal detention.[17] *Harris v. Nelson, supra,* 394 U.S. at 299, 89 S.Ct. 1082 *et seq. See Adderly v.*

*Wainwright, supra,* 272 F.Supp. at 532. Given the need for cutting through multi-jurisdictional procedural mazes and proceeding expeditiously, the court quite properly proceeded with respect to the class as a whole in a single forum.[18]

■ However, we note that the district court's habeas jurisdiction is limited. It may grant the writ only as to children presently detained within its territorial jurisdiction (there are still a substantial number), *Ahrens v. Clark,* 335 U.S. 188, 68 S.Ct. 1443, 92 L.Ed. 1898 (1948), or to those who were within its jurisdiction when the application was filed, and subsequently removed. *Ex Parte Endo,* 323 U.S. 283, 305–306, 65 S.Ct. 208, 89 L.Ed. 243 (1944). Almost half of the children airlifted were processed through the Northern District of California, and some may have been in the court's territorial jurisdiction when the complaint was filed. We think the court may appropriately ascertain the status of all of the children in order to determine those over whom it has jurisdiction. However, should plaintiffs choose to seek their remedy in habeas, rather than amend if they are able to do so, it may be necessary to file new applications in the jurisdictions where each child is located. *See United States ex rel. Jimenez v. Conboy,* 310 F.Supp. 801 (S.D.N.Y.1970).

■ We turn finally to the plaintiffs' major grievance with the district court's order—that it improperly restricts access to the children's records. We agree. The district court required the INS to provide on a random basis one out of

---

17. 28 U.S.C. § 2242 requires the naming of the custodian "if known," seemingly contemplating the power of the district court to develop the fact if unknown. The statute explicitly provides for supplementation of the application. The court has ample discovery powers to that end. *See Developments, supra,* at 1179 *et seq.*

18. Given the possibility of amendment, we need not at this point resolve whether the district court in habeas may deal with the application as a class action in litigating the merits, or whether, once identities are ascertained, individual applications must be filed for each

child whose status is questionable. We leave it to the district court, mindful that habeas eschews formalistic distinctions and obstacles, and that the All Writs Act provides him a "legislatively approved source of procedural instruments designed to achieve 'the rational ends of law,'" *Price v. Johnston,* 334 U.S. 266, 282, 68 S.Ct. 1049, 1058, 92 L.Ed. 1356 (1948), quoting *Adams v. United States ex rel. McCann,* 317 U.S. 269, 273, 63 S.Ct. 236, 87 L.Ed. 268 (1942), to chart the best course for hearing the interested parties and resolving the merits of the claims.

three investigative files for *ex parte in camera* inspection, and provided that the court would made a sampling available to plaintiffs' attorneys. This was improper. While the claims of illegal detention are presented as a class, it is individuals among the group who are illegally detained. The INS is an adverse party—it is plaintiffs' attorneys who represent the children's interests at this discovery stage. They (and the court) must have access to each child's file to determine if it is potentially a member of the illegally detained class, whether further investigation is necessary, and eventually to litigate the merits. The random *ex parte* procedure adopted below impermissibly threatens the burial and disregard of the rights of children who fall within the class.

 The records are confidential but not privileged. Plaintiffs do not seek information regarding the prospective adoptive parents. They seek information from INS files which the INS may and must accumulate to determine the children's admission and adoption status. *See* 8 C.F.R. § 204.2(d)(1) and (2). Having read the defendants' contentions suffice it for us to say that we can perceive no basis for finding the plaintiffs own records absolutely privileged from disclosure to the plaintiffs' representatives given the need presented here. Neither state adoption laws limiting disclosure of adoption records nor the Freedom of Information Act, 5 U.S.C. § 552, mandate the suppression of the information in the face of the federal habeas court's plenary investigatory power—if anything, they suggest the propriety of discovery here. However, while the district court should not and need not proceed *ex parte*, it may, of course, screen out information not necessary to plaintiffs' purposes, regulate the timing of disclosure, and otherwise surround plaintiffs' access to the records with appropri-

ate protective orders to guard against disclosure or abuse of the information.[19]

The order, as modified August 14, 1975, and as modified herein to allow plaintiffs' access to records, is affirmed, and the matter is remanded to the district court for further proceedings consistent with the views herein expressed. The mandate shall issue forthwith. No costs.

---

**19.** We reject the remainder of the plaintiffs' objections to the order—it was well within the court's discretion on each of the matters complained of. When investigating particular uncertain cases, plaintiffs may renew their request, and the court may then deem it advisable, to permit plaintiffs to use trained child welfare personnel and Vietnamese interpreters to investigate a child's situation, again subject to an appropriate protective order.